BRENT SMITH,

              Petitioner,                                  Case Number: 05-CV-72971
                                                        Honorable George Caram Steeh

v.

KURT JONES,

              Respondent.

_____/

## OPINION AND ORDER  CONDITIONALLY GRANTING
## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Brent Smith, a Michigan state prisoner, has filed an application, through his attorney, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Smith was convicted by a jury in Michigan's Oakland County Circuit Court on three counts of criminal sexual conduct in the second degree.  Smith was sentenced on each count to a minimum of four years, and a maximum of fifteen years, the sentences to run concurrently.  For the reasons set forth below, the Court conditionally grants Smith's petition for writ of habeas corpus.[1]

## I.

Smith's convictions arise from an incident occurring in the early hours of December 23, 2000, in the City of Berkley, Michigan.  During a routine patrol of the rear of the Berkley Front Bar, Smith, a Berkley police officer, investigated two allegedly intoxicated minors, Shannon Sargent and Peter Marinelli, in a parked car.  Sargent, who admitted that she was intoxicated and an under-age drinker, claimed that Smith improperly searched her underneath her clothes in the back of his scout car, touching intimate areas of her body.  Smith denied searching Sargent

---

[1]This Court will only discuss the facts relevant to the resolution of the claims on which Petitioner is being granted habeas relief.

improperly at any time.

Sargent, the complainant in this case, testified that there was not one search, but rather, there were two searches. She testified that she did not object to the first search; rather, it was the second search, where Smith went under her clothing and touched intimate areas, that was objectionable, though she consented at the time. When questioned about drinking, Sargent admitted that, although she was underage, she had consumed several vodkas and had a driver's license of another person as her false identification card. It was Sargent's testimony that she was "buzzed" and was making out with her boyfriend in his car behind the Berkley Front Bar when Officer Smith investigated their parked car.

According to Sargent's testimony, Smith told her that there was a drug problem in the area and requested to search her. She testified that Smith first patted her down in his squad car, with her consent. Sargent said that Smith told her that her male companion had consumed too much alcohol to drive, and performed a PBT on both of them. Subsequently, according to Sargent's testimony, Smith asked to search her again. She testified that she consented to the second search.

Regarding the second search, Sargent testified that Smith said, "I hate doing this. Do you want a woman cop?" Sargent said that she didn't know whether she wanted a female officer to conduct the search, rather, she testified that she just wanted to get it over. It was her testimony that Smith told her what he was doing as he was searching her; and, in the process of the search, Sargent testified that he went inside her clothing, touched and rubbed her genital area very quickly, felt around her stomach, went down the front of her dress and went down her back. Sargent testified that the second search occurred about ten to fifteen minutes after she was given the PBT test, and before the second officer arrived on the scene. According to Sargent's testimony, she never refused Officer Smith permission to search under her clothing. No one else

who was present at the Berkley Front Bar witnessed the second search.

Officer Robert Ginther, also an officer with the Berkley Police Department, arrived on the scene as back-up. He testified that Smith told him that he (Smith) had caught a couple of lovers in a car, that both of them were too intoxicated to drive, and that he (Smith) was going to give them a break and drive them to Denny's Restaurant. Officer Ginther testified that when he arrived, he saw Smith bringing the PBT back through the divider of his squad car and witnessed that it looked like it had been activated. Officer Ginther testified that he did not see Smith search Sargent.

Sargent's boyfriend, Peter Marinelli also testified. He said that he witnessed a conversation between Sargent and Smith in the patrol car, but never saw Sargent searched. It was his testimony that Smith was alone with Sargent for about fifteen minutes.

Marinelli admitted that he and Sargent were underage and that they had been drinking. He said that he had consumed six mixed drinks on the evening in question. He admitted that he was under the influence. He also admitted that he was kissing and fondling Sargent in his car when Smith pulled up to his car.

Marinelli testified that Smith searched him before he entered the back of the squad car, where Sargent was sitting. It was Marinelli's testimony that Smith told him that he blew .05 on the PBT, and that Sargent blew .20, and was unable to drive. He said that, at one point, while he was waiting for Sargent in his car, Smith walked up to his car and said, "you're scaring me," and pushed his side-view mirror upward. Marinelli then said that Smith drove them to Denny's. Neither Sargent nor Marinelli was ticketed or arrested.

Smith testified. According to his testimony, he detained and searched Sargent and Marinelli during a routine patrol of the rear of the Berkley Front Bar. He said that previously he had arrested individuals for using drugs, and had caught individuals having sex, behind that bar.

Smith said that when he shined a flashlight in the car occupied by Sargent and Marinelli, he saw a male leaning over the top of a female, with the seat reclined; the male was fondling the female and kissing her.  When Smith knocked on the window, Marinelli jumped back into the driver's seat, zipping his pants.  As Sargent was putting her clothes back together, Smith could see that she was upset and crying.  Smith testified that, while he was investigating, he had smelled burning marijuana, but did not smell marijuana from inside the car; however, he did smell a strong odor of intoxicants coming from both Sargent and Marinelli.

Smith asked Sargent for some identification–she produced an expired driver's license with the name of Melissa Masouras on it.  According to the license, Melissa was twenty-two-years old.  Smith asked Sargent to step out of the car and, then, he contacted dispatch, telling them that he was continuing on with his investigation.  Because Sargent appeared intoxicated, according to Smith's testimony, he escorted her back to his car.  He testified that, as they were walking back to his car, Sargent stumbled and had to use the car for guidance in walking.

Smith testified that he then asked Sargent if he could search her or if she wanted a female officer.  Sargent consented to the search.  According to Smith's testimony, there were no female officers working for the Berkley Police Department on the midnight shift, and the search policy was to search females the same way you would a man.  Smith testified that he had personally searched female arrestees twenty to forty times.  Smith said that he searched Sargent a single time over her clothes, before he placed her in his squad car.

Smith testified that he also searched Marinelli, and his vehicle, with consent.  When he found nothing illegal in his searches, he asked Marinelli to have a seat in his own (Marinelli's) car.

According to Smith's testimony, Sargent told him that she knew Marinelli and that the incident was a consensual situation.  She told him that she was really eighteen-years-old,  that

Marinelli was twenty, and that they both had fake identification cards. Marinelli then produced two fake identification cards, which Smith confiscated.

When Smith dropped Sargent off at Denny's, she was still very upset. Marinelli testified that he thought she was upset from getting caught drinking underage. After Smith dropped them off at Denny's, he realized that he forgot to retrieve Sargent's false identification card; he then returned to Denny's to get the card.

Both Smith and Officer Ginther talked to the manager of the Berkley Front Bar regarding permitting underage drinking. According to Smith, he did not make a report; rather, he talked to his shift commander who told him he did not have to make a report and to hang on to both Sargent's and Marinelli's fake identification cards.

Before the trial commenced, the trial court ruled, over objections by defense counsel, that the prosecution could also present two other female witnesses, Corrine Steinbrenner and Kristin Oliver, as similar acts witnesses. The trial court found that their credibility and veracity was a question for the trier of fact, found that their allegations against Smith were close and similar, and found that the evidence was relevant to showing a plan, scheme, or system that Petitioner may have used, and that their testimony was relevant to rebut any fabrication.[2]

Oliver was first to take the stand and testified that, in 1998, Smith arrested her for drunk driving. She admitted that she was intoxicated. She testified that, at the scene of the arrest, Smith searched her outside her clothes, handcuffed her, and then drove her to the Berkley police

---

[2]However, after hearing the testimony of Oliver and Steinbrenner, the trial judge concluded at sentencing that their allegations lacked credibility and were "vague and ambiguous."

> The other two women–the jury discounted and, frankly, I found so vague and ambiguous in their testimony, that the Court can give no weight to it. I'm going to be very blunt. The, there was–the second was almost ludicrous, and the first one's credibility was, frankly, destroyed by Mr. Correll in his cross-examination. (Sentencing Tr. p. 10.)

station.  According to Oliver's testimony, when she arrived at the police station, she said that Smith then performed a second search, where he tried to go inside her bra and inside her pants, but because her undergarments were tight, he was unsuccessful.  It was Oliver's testimony that when she requested to go to the bathroom, Smith told her that she would have to remove the tight undergarments.  Subsequently, according to Oliver's testimony, Smith then conducted another search of her person, where he went inside her pants and cupped her vagina.  Oliver claimed that Smith had confiscated her underwear.  According to her testimony, there were at least two other officers present in the station when the searches allegedly occurred.  She said that she was not aware that there were video cameras in the area where she was searched that recorded her conduct at the time of the incident.

On cross-examination, Oliver admitted that she was given back all her belongings, including her underwear.  Oliver became aware of this case because of its publicity.  She testified that once she became aware, she then filed a federal lawsuit against the Berkley police department and Smith.

When Smith was questioned about the alleged incident with Oliver, he confirmed that he had arrested her, after she made an illegal turn, and ran a red light.  He testified that she blew .12 on the PBT.  Smith also confirmed that he searched her when he placed her in the holding cell, but he said that he searched her the same way he had searched her on the road, and that the search was in the presence of other officers.  Smith denied any improper search of Oliver's intimate areas.  He also testified that there were videotapes of the area where the search was conducted, which were kept for several months, but were no longer available.  It was Smith's testimony that he never confiscated an undergarment from Oliver.

Steinbrenner, the second 404(B) witness,  testified that in June 1998, at about 3:00 a.m., she was driving her friend's car when she was stopped by Smith for failing to stop at a stop sign

and failing to use her turn signal. Steinbrenner was sixteen years old at the time, and she did not have a driver's license. However, when stopped and asked by Smith if she had a driver's license, Steinbrenner lied and said that she had a license, but that it was at her house. Smith arrested her for driving without a license.

According to Steinbrenner's testimony, Smith searched her over her clothing outside her car at the scene of the arrest. She said that he also searched her friend and the car. It was Steinbrenner's testimony that Smith searched her a second time, groping her breast for about five seconds during the search. Steinbrenner said that she did not file a complaint immediately but waited several days. Eventually, Steinbrenner went to the Berkley police station, with her mother and father, and filed a complaint, although she testified that, to her knowledge, nothing happened with the complaint. During cross-examination, Steinbrenner admitted to making inconsistent statements as to how many times Smith grabbed her breasts or when he grabbed her breasts.

Smith admitted that he arrested Steinbrenner after she ran a stop sign and turned without signaling. He said that he took her to the patrol car and searched her, but said that he never cupped or grabbed her breasts. Smith testified that he took her to the police station and gave her a ticket. He said that her mother picked her up at the station. Smith said that he also gave a traffic citation to the male who had permitted Steinbrenner to drive. According to Smith's testimony, he had been advised that Steinbrenner made a telephone complaint. Smith denied any wrongdoing. The department did not discipline Smith for the matter.

Sergeant Raymond Anger, a detective at the Berkley Police Department, and a witness for the prosecution, testified that he executed a search warrant for Smith's locker and found Melissa Masouras's driver's license and other confiscated driver's licenses of male drivers. According to his testimony, the Berkley police officers do not always file a report if they let

someone go on an OUIL. It was his testimony that the officers cannot tag evidence unless there is a report. Sergeant Anger testified that the police records showed that Smith checked Melissa Masouras's and Peter Marinelli's driver licenses on the state lien system on December 23, 2000, and that Smith was investigating a parked car at the Berkley Front Bar from 1:46 a.m. to 2:12 a.m. on that date.

Regarding the Steinbrenner complaint, it was also Sergeant Anger's testimony that there was no reprimand or disciplinary action taken against Smith. He said that the decision not to discipline was the decision of the Berkley chief of police. Sergeant Anger testified that he had nominated Smith as Officer of the Year in 1999.

In rebuttal, the prosecution called Berkley police chief, Bruce Henderlight. He testified that Anger's testimony and Smith's testimony regarding Smith not being disciplined for the Steinbrenner complaint was wrong. Officer Henderlight testified that there were no other complaints of a sexual nature against any other Berkley police officers. Defense counsel did not object to that line of questioning. Officer Henderlight also admitted that there were no female officers working the midnight shift on the day in question.

Because there was extensive pre-trial publicity that Sargent had passed a polygraph, some, not all, jurors, during *voir dire*, were asked if they had formed an opinion based on what they had read in the newspaper. They were not asked how what they read affected them. Additionally, many of the jurors were never asked if they were exposed to any pre-trial publicity.

During the prosecution's closing argument, and during rebuttal, the prosecutor asked the jury to rely on the testimonies of the "similar-acts" witnesses to determine that Petitioner had the propensity to commit the offenses as charged. The prosecutor stated, "He's done it before. He started off with Kristin." (Trial Tr. Vol. V, dated Sept. 14, 2001, p. 764.) The prosecutor argued that if Kristin Oliver had complained at the time of her arrest, then Sargent would not have had

to go through this trial.

The prosecutor also claimed that Officer Anger, and the whole Berkley police department, wished they had done something more when the Steinbrenner complaint was filed against Smith, "after three girls" were now attacked by Petitioner.  (Trial Tr. Vol. V, p. 824.) She argued that Sargent "hit the lottery" when she accused Petitioner, that Sargent should play the lottery because she picked a defendant who had three complaints in two and one half years, and Sargent "just happened to pick the right guy."  (Trial Tr. Vol. V, pp. 824-825, 828.)

The prosecutor also emphasized the fact that there were no other complaints against other Berkley officers.  She told the jury that they should vote not guilty only if they did not believe all three women.  The prosecutor reminded the jury of Steinbrenner's statement that the "pervert," Smith, should be taken off the road.  (Trial Tr. Vol. V, p. 767.)  She told the jury to decide in favor of the defendant (Petitioner) only if they would be comfortable with their daughters being stopped at three o'clock in the morning by Smith.

The prosecutor also stated "this is not about going after a person who's not guilty.  That would be every prosecutor's worst nightmare."  (Trial Tr. Vol. V, p. 815.)  She said that if the complainant had changed her story to say that there had been sexual penetration "we would believe her" and would have charged the crime differently.  (Trial Tr. Vol. V, p. 822.)  Although no expert witness had testified at trial, the prosecutor argued to the jury that it is common for victims in sex crimes to repress the most significant thing, in this case, digital penetration by Smith.[3]

Additionally, during the trial, there was extensive questioning of Sargent and her family as to whether they planned on suing Smith.  Sargent and her family admitted to hiring an

_____

[3]Initially, Sargent said that Smith had penetrated her vagina with his finger, but later, changed her story and said that no penetration occurred.  It was Sargent's position that she no longer had a memory of that event.

-9-

attorney, but said that the attorney had been contacted for legal advice only, and was not hired to file a civil suit against Smith. However, only two days after Smith was sentenced, that same lawyer filed a lawsuit against Smith on behalf of Sargent.

Smith was charged with three counts of criminal sexual conduct in the second degree. His trial began on September 10, 2001, and was adjourned for part of a day on September 11, 2001, because of the terrorists' attacks in New York City. On September 17, 2001, Smith was convicted of all three counts of criminal sexual conduct in the second degree.

Following his convictions, Smith was sentenced on October 24, 2001. Smith, through counsel, filed a first right of appeal with the Michigan Court of Appeals, raising the following claims:

> I. Was the evidence of alleged similar acts of the Defendant admitted in violation of MRE 404(B) and in violation of the Defendant's right to due process of the law and his right to a fair trial pursuant to the United States Constitution?
>
> II. Did the prosecutor's misconduct deny the Defendant a fair trial, as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution?
>
> III. Should the trial court have granted a new trial to the Defendant when it was revealed after sentence that the Complainant and her family had intentionally misrepresented whether they planned to sue the Defendant; Was the Defendant denied his Sixth Amendment right to confront his accuser by her false denial of her intent to sue the Defendant?
>
> IV. Did the admission of improper, prejudicial hearsay evidence, rebuttal evidence and opinion evidence require a new trial; and denied the Defendant his right to confront his accusers and his right to a fair trial, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution?
>
> V. Did the voir dire of the jury in this case, where there was prejudicial, pretrial publicity, fail to meet the minimum standards of *People v. Tyburski*; and deny the Defendant a right to a fair jury trial under the Fifth, Sixth, and

Fourteenth Amendments of the United States Constitution?

VI.     When the Defendant's search and seizure defense and consent defense was never presented to the jury, was the Defendant's due process right to present a defense consistent with the Fifth and Fourteenth Amendments of the United States Constitution violated?

VII.    Did the Defendant receive ineffective assistance of counsel at his trial in violation of the Sixth Amendment of the United States Constitution?

VIII.   Did the cumulative effect of the errors at the Defendant's trial deny his right to a fair trial, as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution?

IX.     Can the Defendant, a police officer, who engaged only in a consent search of the Complainant that was not a strip search or a body cavity search, be convicted of criminal sexual conduct; in his conviction against the great weight of the evidence, not supported by sufficient evidence, and violates due process rights of the Defendant under the Fifth and Fourteenth Amendments of the United States Constitution?

On October 7, 2003, the Michigan Court of Appeals affirmed Smith's convictions.

*People v. Brent Smith*, No. 238005, 2003 WL 22301047 (Mich. Ct. App. Oct. 7, 2003) (unpublished). Smith filed a motion for rehearing, which was also denied. Smith then filed an application for leave to appeal in the Michigan Supreme Court, which was denied on August 31, 2004. *People v. Brent Smith*, 471 Mich. 870, 685 N.W.2d 672 (2004). Smith's petition for a writ of habeas corpus was filed with this Court on July 29, 2005. In the petition, Smith raises the following issues:

I.      The prosecutor's misconduct denied the Petitioner a fair trial and due process of law in violation of Amendments V, VI, and XIV of the United States Constitution.

II.     The Petitioner received ineffective assistance of counsel at his trial in violation of amendment VI of the United States Constitution; ineffective assistance also caused violations

of Amendments V and VI at Petitioner's trial; the failure of either the trial court or the Court of Appeals to hold a hearing at which the Petitioner could present his claims of ineffective assistance violated the Petitioner's due process rights.

III.    The Petitioner, a police officer, who engaged only in a consent search of the Complainant that was not a strip search or a body cavity search, is not guilty of criminal sexual conduct; his conviction is against the great weight of the evidence, not supported by sufficient evidence, and violated the due process rights of the Petitioner under Amendments V and XIV of the United States Constitution.

IV.    The admission of improper, prejudicial hearsay evidence denied the Petitioner his right to confront his accusers, in violation of Amendment VI of the United States Constitution.

V.    The cumulative effect of the errors at the Petitioner's trial denied his right to due process of the law and a fair trial, as guaranteed by Amendments V, VI, and XIV of the United States Constitution.

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs habeas corpus review of state court decisions. 28 U.S.C. § 2254(d) states in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under the "contrary to" clause of § 2254(d)(1), a federal court may grant a writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the Supreme Court on

a question of law, or if the state court decides a case differently than the Supreme Court has decided an issue on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause of § 2254(d)(1), a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts. *Id.* at 407-08. Relief is also available if the state court decision unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable." *Williams*, *supra* at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

### A.

Smith first claims that he is entitled to habeas relief due to four alleged instances of prosecutorial misconduct involving: (1) improper use of the similar-acts evidence at trial; (2) improper statements of personal belief of the Petitioner's guilt; (3) arguing evidence not of record; and (4) personally attacking defense counsel. However, Smith's primary prosecutorial misconduct claim is that he was deprived of his constitutional right to a fair trial by the prosecutor's extensive use of the 404(b) witnesses' testimony as character evidence to prove his propensity to commit the alleged criminal sexual conduct in this case. The Michigan Court of Appeals, the last court to issue a reasoned decision in this case, rejected prosecutorial misconduct claims 1, 3, and 4, and found claim 2–improper statements of personal belief of the Petitioner's guilt–made during the prosecutor's rebuttal argument–were improper but curable by an objection and instruction to the jury. *Smith*, No. 238005, 2003 WL 22301047, slip op. at 9-11.

To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate

that the prosecutor's remarks or conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). When addressing claims of prosecutorial misconduct, the court must first determine whether the challenged statements were indeed improper. *See United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Prosecutorial misconduct must be so egregious as to deny a petitioner a fundamentally fair trial. *Donnelly*, 416 U.S. at 643-45.

The Sixth Circuit applies a two-step approach in determining whether prosecutorial misconduct violated a criminal defendant's due process rights: (1) whether the prosecutor's conduct and remarks were improper, and if so: (2) whether the impropriety was flagrant. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). Whether prosecutorial misconduct was flagrant is decided by weighing four factors: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks [or conduct] were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Macias*, 291 F.3d at 452 (quoting *Carter*, 236 F.3d at 783). Whether the trial court gave cautionary instructions also factors into the calculus of determining whether fundamental fairness was denied. *Serra*, 4 F.3d at 1356. *See also United States v. Payne*, 2 F.3d 706, 715-16 (6th Cir. 1993) (inflammatory remarks in opening and closing statements and throughout trial were not cured by cautionary instructions); *United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) (closing argument that appeals to the community conscience was cured by instructions).

# 1. Procedural Default

Respondent asserts that Petitioner's prosecutorial misconduct claims are procedurally defaulted because of his failure to object to the challenged conduct at trial. Although the Michigan Court of Appeals acknowledged Petitioner's prosecutorial misconduct claims were not properly preserved for appeal, it nonetheless addressed each act that Petitioner asserted substantiated the alleged prosecutorial misconduct on the merits and concluded that Petitioner was not entitled to relief. *Smith*, No. 238005, 2003 WL 22301047, slip op. pp. 7-11.

The Sixth Circuit applies a multi-part analysis in order to determine whether procedural default precludes the federal courts from granting habeas relief. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). First, the court must determine (1) whether there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) whether the state courts actually enforced the state procedural sanction; and (3) whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* If the answer to those questions is yes, then the court must inquire into whether the petitioner can obtain habeas relief by demonstrating under *Wainwright v. Sykes*, 433 U.S. 72 (1977), "that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the constitutional error." *Maupin*, 785 F.2d at 138.

Here, it is evident that the first test has been satisfied. As previously stated, the Michigan Court of Appeals acknowledged that the prosecutorial misconduct claims were not preserved for appeal. However, the second test, that the state courts actually enforced the state procedural sanction, has not been satisfied in light of the fact that the Michigan Court of Appeals addressed each issue substantiating Petitioner's prosecutorial misconduct claims and concluded that Petitioner's positions were without merit. It is well settled that where a state appellate court has

adjudicated an issue on its merits, federal courts may consider it in a petition for habeas corpus. *Manning v. Huffman*, 269 F.3d 720, 724 (6th Cir. 2001). Therefore, the Court will address Petitioner's prosecutorial misconduct claims on the merits.

### a. Improper use of similar-acts evidence by the prosecutor to show character and propensity

Petitioner asserts that he is entitled to habeas relief because of the prosecutor's improper use of the similar-acts evidence to show his propensity toward such conduct of two other women, who claimed to have been improperly searched by him after their arrest. Petitioner argues that this evidence was improperly admitted by the trial court.

Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dep't of Corr.*, 4 F.3d at 1354. Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant habeas relief. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003), *cert denied*, 540 U.S. 930 (2003). The United States Supreme Court has declined to hold that similar other acts evidence is so extremely unfair that its admission violates fundamental conceptions of justice.

However, the Supreme Court has recognized, in the context of Fed.R.Evid. 404(a), the dangerousness of evidence of alleged similar conduct: character evidence "weigh[s] too much with the jury and . . . overpersuade[s] them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 476 (1948); *See also Old Chief v. United States*, 519 U.S. 172 (1997) (holding that where a felony is a predicate element of an offense, informing the jury that the predicate felony is a conviction for the same offense that is being tried is more prejudicial than probative).

Here, the prosecution used the similar-acts evidence to demonstrate that Smith had done it before, so, he must have done it this time, and, he would likely do it again.

"A fundamental rule of evidence is that a defendant's 'bad character' cannot be used to argue that the defendant committed the crime for which he is being tried, or had a propensity to commit that crime." *Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000). "[A]nimated recitation of . . . character evidence during closing arguments [is] plainly improper." *Id.* at 700.

In this case, during her closing argument, the prosecutor told the jury: "He's done it before–He started off with Kristin [Oliver]." She continued to argue that Oliver filed a lawsuit when she found out "other women had to go through what she went through." It was the prosecutor's argument that if Oliver had complained at the time of her arrest, then Sargent would not have had to through her trial, thereby implying that Smith would have been convicted and taken off road patrol.

In rebuttal, the prosecutor argued that Sergeant Anger, and the whole Berkley police department, probably wished that they had done something more. She continued to argue that Sargent had "hit the lottery" when she accused Smith, and that she should play the lottery because she picked a defendant who had three complaints in two and one half years.[4] The prosecutor told the jury that there were no other complaints against any other Berkley police officers. She argued to the jury that they should decide in favor of the defendant [Petitioner] only if they would be comfortable with their daughters being stopped at three o'clock in the morning by him.

The Sixth Circuit, in *Gall v. Parker*, 231 F.3d 265 (6th Cir. 2000) and *Bates v. Bell*, 402 F.3d 635 (2005), set aside the death sentences of prisoners in Kentucky and Tennessee, because the prosecutors made appeals to the jury to sentence those defendants to death so that they would not kill again. In those cases, the Sixth Circuit held that the prosecutors comments in closing

---

[4]It should be noted that, prior to trial, there were several articles in the Detroit Free Press, discussing the Sargent incident.

arguments in both cases were riddled with wildly inappropriate and inflammatory remarks in violation of what the Sixth Circuit has described as "the cardinal rule that a prosecutor cannot make statements 'calculated to incite the passions and prejudices of the jurors.'" *Bates*, 402 F.3d. at 642 (citing *Gall*, 231 F.3d at 315). Inflammatory remarks are improper because they "invoke emotions which may cloud the jury's determination of [the defendant's] guilt." *Martin v. Parker*, 11 F.3d 613, 616 (6th Cir. 1993) (citing *Payne*, 2 F.3d at 716).

Against that backdrop, this Court finds that the prosecutor's closing and rebuttal arguments were inappropriate and inflammatory; the prosecutor did appeal to the fears of individual jurors and to emotion. That conduct was clearly improper, and is an unreasonable application of, or contrary to, clearly established Supreme Court precedent.

### b. Improper statements of the prosecutor's personal belief of the Petitioner's guilt

Petitioner alleges that the prosecutor's conduct in this case was intended to mislead the jury and attack his character. He contends that her conduct throughout the trial and during her closing and rebuttal arguments was deliberate and not accidental. Petitioner argues that the prosecutor vouched for the credibility of the Complainant. In her rebuttal argument, the prosecutor stated, "[t]his is not going after a person who's not guilty. That would be every prosecutor's worst nightmare." The prosecutor also argued in rebuttal that if the Complainant had changed her story to say that there had been sexual penetration "we would believe her" and would have charged the crime differently. Petitioner contends that such conduct by the prosecutor was an appeal to the civic duty of the jury. In her closing argument, the prosecutor said:

> You all took an oath to return a fair and just verdict. Coming back with a not guilty, you'd have to look at Shannon Sargent and say, "I don't believe you." And Kristin Oliver, "I don't believe you." And Corrine, "I don't believe you." You have to tell the Sheriff's Department, the Oakland County Sheriff's Department, "You know what? I'd be okay with having my daughter stopped by him

at three in the morning."

I ask you return the right verdict, and that's guilty as charged on all three counts.

(Trial Tr. Vol. V, p. 828.)

Generally, a prosecutor cannot make statements "calculated to incite the passions and prejudices of the jurors." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). In cases of sexual abuse allegations, which turn on the credibility of witnesses, courts must adhere strictly to the rules of evidence in order to insure a fair trial. The Sixth Circuit stated, in *Martin*, 11 F.3d at 616-617, "[i]n a close credibility contest such as this, with horrible acts alleged but scant hard evidence for a jury to weigh, a prosecutor must be doubly careful to stay within the bounds of proper conduct." Moreover, in *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000), the Sixth Circuit stated, "it is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of a defendant." *Id.* at 537.

In this case, the Michigan Court of Appeals concluded that the prosecutor made an improper civic duty argument, but nonetheless found that the her arguments as such did not require reversal, because they could have been cured by an instruction, and defense counsel's failure to object did not give the trial court an opportunity for an instruction. It also found that defense counsel's failure to object was acceptable trial strategy. The state appellate court stated:

> This was an improper appeal to civic duty and, arguably, was an
> improper request that the jury sympathize with the
> victim/complainant. Further, the remarks were made in rebuttal, to
> which defense counsel did not have opportunity to respond.

> * * *

> We conclude, however, that any prejudicial effect could have been
> cured by an appropriate instruction, *Watson*, *supra*, and we are
> satisfied that the jury did not convict based on the improper
> argument.

*Smith*, No. 238005, 2003 WL 22301047, slip op. at 10.

This Court disagrees with the Michigan Court of Appeals's analysis of the prosecutor's comments. Rather, this Court finds that, again and again, the prosecutor explicitly expressed her personal opinion. To be certain, a prosecutor can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence. However, prosecutors cannot put forth their opinions as to credibility of a witness or the guilt of a defendant. "[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985).

### c. Arguing evidence not of record

Petitioner also claims that the prosecutor argued facts to the jury that were never admitted into evidence. Asserting facts that were never admitted into evidence may mislead a jury in a prejudicial way. *Washington v. Hofbauer*, 228 F.3d at 700 (citing *Berger v. United States*, 295 U.S. 78, 84 (1935). "This is particularly true when a prosecutor misrepresents evidence because a jury generally had confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty." *Berger*, 295 U.S. at 88.

Against that backdrop, it was improper for the prosecutor to take on the mantle of an expert witness and opine to the jury that it is common for victims of sex crimes to repress the most significant abuse. (Sargent had originally claimed that Smith had penetrated her with his finger, but later, at the time of the trial, she said that she had no memory of that anymore. [Trial Tr. pp. 821-822]). The prosecutor argued in rebuttal:

> Also, he talks about the word "penetration." You know why Shannon was so upset that night? She felt her vagina had been penetrated with a finger. She gave details about her vagina. She said she felt it, she sensed it. She wouldn't have written it if it wasn't true. Now, he's not charged with that because she doesn't remember that anymore. It would be a whole different type of

sexual assault if we were charging him with penetrating it. It would be a first degree or a third degree. It wouldn't be the ones we have here. He's not being charged with that 'cause she's being truthful. Do you know how easy it would have been for her to take the stand last March, the first time we came to court in this case, and for her to say, "Yeah. That's when he penetrated me. That's when his finger went up halfway inside me," and continue to say that over and over and over again? Look at the attacks that they wouldn't have been able to have on her for that one. But she's honest and she said, "Yes, I swear to, I swear to tell the truth," and she said, "I just don't remember that anymore. I'm blocking it." She is in therapy. They're going to hold it against her if she is in therapy, but, for some reason, Kristin is not in therapy, and you should hold that against Kristin 'cause she's not in therapy, but Shannon is in therapy, and you've got to hold that against Shannon? That doesn't make any sense. Shannon had blocked it. She testified, "I just don't feel it anymore, I just don't sense it anymore." That makes sense. Even Mr. Correll said, "People do repress things." You know, but he says it's common and, you know, kids remember it later. How about it's common in sexual assault victims to repress the most significant thing that happened here, the worse thing? You don't want to remember that. How about that?

(Trial Tr. pp. 821-822.) The Michigan Court of Appeals found that the prosecutor's remarks were in response to the defense theory of fabrication and that any prejudicial effect could have been cured by an appropriate instruction. *Smith*, No. 238005, 2003 WL 22301047, slip op. at 10. This Court disagrees.

No expert witness ever testified for the prosecution at the trial that "it's common in sexual abuse victims to repress the most significant thing that happened here, the worse thing," penetration. The prosecutor, acting as her own expert witness, misrepresented Sargent's trial testimony – that she did not remember petitioner having penetrated her vagina – as evidence that digital penetration had in fact occurred. Without the prosecutor's unsupported representation to the jury that sexual assault victims commonly repress their memory of the worst event of a sexual assault, the assertion that a sexual penetration must have taken place *because* Sargent forgot the event would make little sense. As a result of the prosecutor's misrepresentation of the

evidence, the jury could likely conclude that, because petitioner penetrated Sargent, it followed that petitioner must have committed the lesser crimes for which he was actually charged.  The prosecutor bolstered her assertion that Sargent's lack of memory supported a finding that a sexual penetration had occurred by arguing, without supporting evidence, that Sargent had been to several therapists.  The court finds that the prosecutor referred to evidence not in the record for the purpose of enhancing Sargent's credibility in the eyes of the jury.  Such bolstering is improper.  *United States v. Francis*, 170 F.3d 546, 551 (6th Cir.  1999) (stating that improper "bolstering occurs when the prosecutor implies that the witness's testimony is corroborated evidence known to the government but not to the jury").  The court finds that the prosecutor's boosting of Sargent's credibility based on facts not in evidence constituted clear misconduct.

Here, the Court finds that the prosecution did more than merely inform the jury that Sargent "must have" stated that penetration occurred at some point, or that she did not recant her story, but because of the incident, she was experiencing "repressed" memory.  The prosecutor also stated that because Kristin Oliver found out about the other women who had made complaints about Smith, she filed a lawsuit, and that Sargent had been to several therapists.  However, there was in fact no evidence to support any of those contentions.  Hence, the Court finds that the prosecutor's boosting of Sargent's credibility based on facts not in evidence constituted clear misconduct.

### d.  Personally attacking defense counsel

Petitioner next claims that the prosecutor made a direct appeal to the emotions of the jury by emphasizing, one by one, that each one of the women cried when defense counsel's cross examined them.  She then engaged in a personal attack on defense counsel, when she also accused him of having made Sargent cry during her cross-examination.  The Court also finds that the prosecutor's conduct in this situation was improper.  It is plainly improper for a prosecutor to

level a personal attack against opposing counsel. *Young*, 470 U.S. at 9 (noting an attorney "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate"); *Carter*, 236 F.3d at 785 ("[I]t is improper for counsel to make personal attacks on an opposing advocate."). If permitted, such conduct by the prosecutor calls the fairness of the trial into question.

For the foregoing reasons, the Court finds that the prosecutor's conduct was improper.

**B.**

Having determined that the prosecutor's conduct was improper, the Court now considers whether the misconduct was so flagrant as to warrant habeas relief for Petitioner.

First, the remarks made by the prosecutor almost certainly prejudiced Petitioner. The jury was told that they would basically be accomplices to the crime unless they convicted him. The prosecutor made it a theme of her summation that the jury's failure to convict Smith would be akin to ordering the sexual abuse of Smith's next victim. Voting not guilty for Smith meant that the juror's daughters would be in jeopardy if they were stopped by Smith in the wee hours of the morning. That type of appeal to fear and emotion clearly poisoned the trial.

Second, the prosecutor's improper conduct was not isolated to one comment or one section of the argument. More importantly, the prosecutor laced her closing argument with personal opinion and undignified and unprofessional appeals to fear. "Standing alone, a prosecutor's comments upon summation can 'so infect [a] trial with unfairness as to make the resulting conviction a denial of due process'" *See Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002).

Third and most regrettably, the misconduct was plainly deliberate. The Court here is not confronted with simply an off-handed remark in a heated trial. Rather, the prosecutor in this

case opted to select inappropriate arguments and use them repeatedly during summation.

If a habeas court is in "grave doubt" as to the harmlessness of an error, the habeas petitioner must prevail. *See O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). The Court finds that the prosecutor's improper argument clearly prejudiced Smith. The prosecutor's unnecessary and intolerable conduct injected such vitriol into the proceedings, as to question the fairness of the trial. Petitioner is therefore entitled to habeas relief on his prosecutorial misconduct claims.

### C.

The Court must now assess whether defense counsel's failure to object to the prosecutor's misconduct violated *Strickland v. Washington*, 466 U.S. 668 (1984).

An essential ingredient of the Sixth Amendment right to counsel is that counsel provide constitutionally effective assistance. *See Powell v. Alabama*, 287 U.S. 45, 57 (1932). To establish that his counsel was ineffective, Petitioner must prove that (1) "counsel's performance was deficient" and (2) "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. A strong presumption exists that counsel afforded the defendant reasonable professional assistance. *Id.* at 689. To satisfy the second prong of the *Strickland* test, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Therefore, "an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken." *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002).

In this case, the Court finds that the Michigan Court of Appeals' application of *Strickland* was not simply incorrect, but was objectively unreasonable, meeting even the high threshold required by the AEDPA. The prosecution's tactics and challenged statements amounted to

unfair and prejudicial misconduct plainly meriting an objection and curative instruction.  Yet, defense counsel sat in silence.  At the most pivotal moments, this Court concludes, his silence could not have been part of reasonable trial strategy.  The Michigan Court of Appeals' assessment of the events was inadequate, failing to appreciate or even consider the critical issues involved.  Throughout its opinion, the state appellate court found that defense counsel's actions in this case were simply his trial strategies that "[were] not below an objective standard of reasonableness" and that the outcome "would not have been affected had the objections been made."  *Smith*, No. 238005, 2003 WL 22301047, slip op. at 15.

This Court finds that the state appellate court failed to understand the concept of strategy and unreasonably applied that concept.  "[T]he label 'strategy' is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel."  *Washington v. Hofbauer*, 228 F.3d at 704 (citing *Lovett v. Foltz*, No. 88-1682, 1989 WL 101522 (6th Cir. Sept. 5, 1989) (unpublished opinion).  Even with that articulated strategy, it does not explain why defense counsel did not object to the prosecution's most egregious character attacks during her closing and rebuttal arguments.  The risk of prejudice inherent in that strategy would have made a reasonably competent attorney doubly cautious about the potential misuse of that evidence.

The Court also finds that counsel's failure to object to the prosecutor impeaching Petitioner on why he did not give his side of the story to the police demonstrated ineffectiveness.  The United States Supreme Court has held that if a police officer is compelled by his own department to give a statement, that statement cannot be used by the prosecution against him.  *Garrity v. New Jersey*, 385 U.S. 493 (1967).  The impeachment of Petitioner with his silence therefore was a violation of his rights and, because defense counsel did not object, unfairness was interjected into Petitioner's trial.

Defense counsel also failed to object to the admission of prior consistent statements of

the Complainant from other witnesses–it is error to admit corroborating hearsay in order to buttress the credibility of a complainant. *Tome v. United States*, 513 U.S. 150 (1995) (prior consistent statements of an alleged victim of child abuse were not admissible).

In short, defense counsel's failure to object to the above fell below an objective standard of reasonableness and constituted an omission outside the wide range of professionally competent assistance. Petitioner has demonstrated to this Court that the failure to object was based on simple neglect or incompetence, and not on sound trial strategy. The Court finds that the state appellate court's application of *Strickland* was objectively unreasonable.

In addition to finding constitutionally defective performance, the Court also finds that the failure to object to the various statements prejudiced Smith's case. Cases of criminal sexual involve a credibility contest, as there is usually no evidence in the record indicating a defendant's guilt outside of a complainant's allegations. Thus, outside of the substance of Smith's and Sargent's testimonies, nothing was more important to the case than the indicia that one story was more believable than the other. In such a case, the prosecutor's misconduct very likely tipped the scales, and the defense counsel's failure to object to the ongoing misconduct and request curative instructions most likely affected the outcome of the trial.

.                                            **III.**

This Court finds that the state court's decisions in this case were contrary to, or an unreasonable application of, clearly established Supreme Court precedent, and finds that Smith has established that he is presently in custody in violation of the Constitution or laws of the United States. On that basis, this Court conditionally grants Smith's petition for a writ of habeas corpus.

Because the Court has concluded that Petitioner is entitled to habeas relief on his prosecutorial and ineffective assistance of counsel claims, the Court considers it unnecessary to

review Petitioner's other claims and declines to do so. *See Haynes v. Burke*, 115 F. Supp.2d 813, 819-820 (E.D.Mich. 2000); *Berrier v. Egeler*, 428 F. Supp. 750, 754 (E.D.Mich. 1976).

**IT IS HEREBY ORDERED**:

That Petitioner's Application for Writ of Habeas Corpus is conditionally **GRANTED**. Unless the State takes action to afford Petitioner a new trial within ninety (90) days of the date of this Order, he may apply for a writ ordering Respondent to release him from custody forthwith.

Dated:  September 25, 2007

<div style="margin-left:40%">

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

</div>

| CERTIFICATE OF SERVICE |
| :---: |
| Copies of this Order were served upon attorneys of record on September 25, 2007, by electronic and/or ordinary mail. |
| S/Josephine Chaffee<br>Deputy Clerk |